UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND, LONDON AND LEXINGTON DIVISIONS

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| **LICKING RIVER MINING, LLC,** *et al.* | : | Chapter 7 |
| | : | Case No. 14-10201 |
| Debtors | : | Jointly Administered |
| | : | |
| _____ | : | |
| | : | |
| **CAMOFI MASTER LDC and** | : | |
| **CAMHZN MASTER LDC,** | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | Adv. No. 15-1006 |
| | : | |
| **U. S. COAL CORP.,** *et al.* | : | |
| | : | |
| Defendants | : | |
| _____ | : | |

**MEMORANDUM OPINION**

In this removed action Phaedra Spradlin, in her capacity as the chapter 7 trustee ("Trustee"), was substituted as the real party in interest for the two debtors/defendants, U.S. Coal Corp. ("U.S. Coal") and J.A.D. Coal Company, Inc. ("JAD"). Before the Court is the Trustee's Motion to Dismiss Adversary Proceeding [ECF No. 21] ("Motion to Dismiss") requesting dismissal not only of the claims against the U.S. Coal and JAD bankruptcy estates, but also the claims against defendant East Coast Miner, LLC ("ECM"). Plaintiffs, CAMOFI Master LDC and CAMHZN Master LDC (collectively the "CAM Funds"), do not contest dismissal of the claims against U.S. Coal and JAD but do oppose dismissal as to ECM. [*See* Mem. Opp'n to Tr.'s Mot. Dismiss, ECF No. 29 (hereinafter "CAM Response").] ECM neither responded to the Motion to

Dismiss nor took a position on the CAM Response. A hearing was held on January 27, 2016, and this matter was taken under submission.

## BACKGROUND AND PROCEDURAL FACTS

### I. Relationship of the Parties

The relationship between the CAM Funds, ECM, U.S. Coal and JAD is succinctly stated by the United States Bankruptcy Court for the Southern District of New York ("NY Bankruptcy Court") in its Memorandum of Decision [ECF No. 1-1] ("Memorandum Decision") denying the CAM Funds' motion to remand their claims against ECM[1] to the New York state court and causing a transfer and referral to this Court.

> The CAM Funds hold equity and debt in U.S. Coal, a Delaware corporation, and its wholly-owned major-operating subsidiary JAD Coal, a Virginia corporation, who are in the coal business. ECM, a Delaware limited liability company, is an investment vehicle that owns debt in U.S. Coal and its subsidiaries that is subordinate to the debt held by the two CAM Funds. In 2009, directors, officers, and shareholders of U.S. Coal formed ECM. ECM was interested in recapitalizing U.S. Coal by purchasing a significant amount of its debt—at a discount—and investing in its equity. The CAM Funds consented to those recapitalization transactions. After the recapitalization transactions, all of U.S. Coal's directors were ECM members.

[Mem. Decision 2-3 (docket citations omitted).] The role of two ECM members, Keith Goggin ("Goggin") and Michael Goodwin ("Goodwin"), affects resolution of the Motion to Dismiss. Goggin and Goodwin were investors in ECM and Goggin was its managing member. At the same time, Goggin and Goodwin were directors, shareholders and creditors of U.S. Coal.

### II. The CAM Funds' Action

The CAM Funds' lawsuit was originally filed in 2012 in the New York Supreme Court in New York County against U.S. Coal, JAD, ECM, several other corporate defendants and individuals, including Goggin and Goodwin. The original complaint asserted claims against U.S.

---

[1] The CAM Funds did not contest the transfer of their claims against U.S. Coal and JAD to this Court.

Coal and JAD for breach of contract, claims against ECM for tortious interference with those contracts and claims against U.S. Coal's directors and officers for breach of fiduciary duty and tortious interference with contracts. In April 2012, prior to transfer of the case to this Court, the defendants filed motions to dismiss. In support, ECM raised an "economic interest defense" which bars a tortious interference claim if the alleged interferer has an economic interest in the interfered-with entity and the alleged interference is with a contractual relationship between the plaintiff and that entity. To overcome the defense, the plaintiff must show malice or illegality to establish a tortious interference claim. *Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 113 (S.D.N.Y. 2015).[2] Accordingly, the CAM Funds countered with allegations that ECM's members breached fiduciary duties in their dual capacities as ECM's members and U.S. Coal's board members. The New York court found these allegations sufficient to state a claim for tortious interference against ECM, but dismissed such claims against the individual defendants. The court stated:

> I note for the record that the reason why this dynamic is very interesting here is, that I have the same board members for U.S. Coal are the same board members for ECM such that there may be, the allegations are sufficient in that regard to sort of give you that air of something not passing the smell test in this regard. But having said that, of course as discovery goes forward things may pan out that these claims may not survive.

[Hr'g Tr. 66:11-18, Dec. 3, 2012, ECF No. 32-3.] The state court instructed the CAM Funds to file an amended complaint which is the Complaint before this Court [ECF No. 1-9] ("CAM Complaint").

The CAM Complaint concerns three agreements entered into among the CAM Funds, U.S. Coal and/or JAD: (i) an April 2008 letter agreement whereby U.S. Coal granted the CAM Funds

---

[2] Both parties applied New York substantive law regarding tortious interference in their arguments before the state court and in their arguments before this Court.

3

certain consent rights with respect to the management of U.S. Coal, including borrowing money, hiring or firing officers, or entering in affiliate transactions ("Management Agreement"); (ii) an agreement requiring U.S. Coal to repurchase its stock from the CAM Funds if U.S. Coal failed to meet certain conditions ("Put Agreement"); and (iii) an equipment note executed by U.S. Coal and JAD in the amount of $4.8 million to be paid to the CAM Funds ("Equipment Note").

In claims one through three, the CAM Funds allege that U.S. Coal and/or JAD breached these agreements. [CAM Compl. ¶¶ 52-69.] As noted earlier, the CAM Funds agree that these claims will be resolved via the claims resolution process in the U.S. Coal and JAD bankruptcy cases and thus agree to dismissal of these claims. [CAM Resp. 11 n.2.]

In claims four through six, the CAM Funds allege that ECM tortiously interfered with the three agreements by intentionally causing U.S. Coal and/or JAD to breach the agreements. [CAM Compl. ¶¶ 70-85.] The specific allegations and alleged damages as to each agreement are discussed below.

### A. The Equipment Note

The CAM Funds assert that ECM, through its members, intentionally caused JAD to default on the Equipment Note by directing that JAD not make payments required under the Equipment Note while the Debtors continued to make payments on indebtedness owed to ECM. [CAM Compl. ¶¶ 31, 33, 79.] In directing that payments be withheld on the Equipment Note, the CAM Funds assert that ECM, through its members, intentionally caused JAD to breach the Equipment Note and that ECM's members abused their authority and violated their duties to U.S. Coal. [CAM Compl. ¶ 79.]

For damages against ECM, the CAM Funds claim they are entitled to payment of $4.2 million, the alleged principal, interest and late fees due on the Equipment Note. [CAM Compl. ¶¶ 62, 80.]  They also claim $4.2 million is owed by JAD [CAM Compl. ¶ 64].

**B. The Put Agreement**

The CAM Funds assert that in 2010, U.S. Coal's then Chief Financial Officer, James Wolff, acknowledged U.S. Coal's obligations to repurchase 425,000 shares of common stock at $5.40 per share from the CAM Funds. [CAM Compl. ¶¶ 36-38.]  This notwithstanding, the CAM Funds assert that ECM, through its members, intentionally instructed U.S. Coal to default on its obligations to repurchase their shares until ECM's debt was paid in full, but honored its obligations to another put holder, Michael Miller, under the same Put Agreement. [CAM Compl. ¶ 39-40.]

In directing that U.S. Coal not repurchase its shares, the CAM Funds assert that ECM, through its members, intentionally caused U.S. Coal to breach the Put Agreement and that ECM's members abused their authority and violated their duties to U.S. Coal. [CAM Compl. ¶ 74.]

For damages against ECM, the CAM Funds claim entitlement to payment of $2.25 million; the same amount of damages asserted against U.S. Coal [CAM Compl. ¶¶ 60, 75]. The CAM Funds do not explain how they calculated this damage claim.

**C. The Management Agreement**

The CAM Funds assert that ECM, through its members, caused U.S. Coal to breach the Management Agreement by entering into the following transactions without obtaining their consent as required by the agreement:

1. Terminating the employment of U.S. Coal's CEO, Robert Gabbard, and then awarding Mr. Gabbard $1.2 million in severance [CAM Compl. ¶¶ 42-43, 81];

5

    2.   Hiring John Collins, a member of ECM, to replace Mr. Gabbard [CAM Compl. ¶ 42, 81]; and

    3.   Entering into multiple material transactions with ECM and other insiders and affiliates resulting in U.S. Coal's obligation to pay in excess of $10 million in additional interest, $3 million of which will be paid to ECM [CAM Compl. ¶¶ 44-51, 81, 84].

In directing U.S. Coal to enter into the above transactions without obtaining their consent, the CAM Funds assert that ECM, through its members, intentionally caused U.S. Coal to breach the Management Agreement, that ECM's members abused their authority and violated their duties to U.S. Coal, and that certain of these transactions will directly benefit ECM and its members. The CAM Funds state that they were damaged by the above actions and assert they are entitled to payment in an amount to be determined at trial.   [CAM Compl. ¶ 84.]

In their final prayer for relief, the CAM Funds request judgment against all defendants for damages in an amount to be proven at trial, but no less than $6.45 million, plus reimbursement of all fees, costs and expenses incurred in connection with enforcing their rights.   They also request rescission of certain debts incurred, and affiliate transactions entered into, by U.S. Coal without the CAM Funds' consent.

### III.   Bankruptcy Proceedings

During summer 2014, creditors commenced involuntary petitions against U.S. Coal, JAD and several affiliates (collectively, "Debtors").[3]   The Debtors' cases were jointly administered and proceeded under chapter 11 until they were converted to chapter 7 on April 24, 2015.   Prior to conversion, the Official Committee of Unsecured Creditors investigated the Debtors' prepetition

---

[3] The remaining affiliated Debtors are:   Licking River Mining, LLC, Licking River Resources, Inc., Fox Knob Coal Co., Inc., S. M. & J., Inc., Harlan County Mining, LLC, Oak Hill Coal, Inc., Sandlick Coal Company, LLC, and U.S. Coal Marketing, LLC.

transactions and on March 24, 2015, filed a complaint against ECM, Goggin, Goodwin, and ECM's affiliate, East Coast Miner II ("ECM II"), commencing adversary proceeding 15-1004 ("Trustee Complaint"). After conversion, the Trustee was substituted as the plaintiff therein.

## IV.  The Estates' Action

In the Trustee Complaint, the Trustee asserts claims against ECM, its principals, Goggin and Goodwin, and ECM II. These claims include fraudulent transfer claims against ECM based on the Bankruptcy Code and state law pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), 550(a) and 551 and Kentucky Revised Statutes § 378.020. In addition, breach of fiduciary duty claims are asserted against Goggin and Goodwin.[4]

The Trustee contends that Goggin and Goodwin orchestrated events so that all of U.S. Coal's board members had an equity interest, directly or indirectly, in ECM. With ECM investors in control of U.S. Coal's board, the Trustee asserts that ECM's interests were placed above those of U.S. Coal, its affiliated debtors, and their creditors in that (i) obligations to ECM were paid ahead of and to the detriment of other creditors; (ii) ECM charged excessive interest, default interest and fees to the Debtors; (iii) U.S. Coal's funds were inappropriately used to pay ECM's attorneys' fees, costs and expenses of organization and litigation brought by third parties; and (iv) ECM refused to agree to a standard subordination agreement to which it had routinely agreed resulting in reduction of Debtors' cash flow and increasing payables to the detriment of the Debtors and their creditors.

The Trustee further asserts that using threats, Goggin and Goodwin caused Robert Gabbard, U.S. Coal's then Chief Executive Officer, to resign with a $1.2 million severance package rather than have his employment terminated. As a result, the Trustee asserts, U.S. Coal

---

[4] The Trustee Complaint contains multiple additional claims against Goggin, Goodwin and ECM II. As those claims are distinct from the claims against ECM in the CAM Complaint, it is not necessary to discuss them herein.

incurred an unnecessary expense of $1.2 million; i.e., had he been terminated for cause, Mr. Gabbard would not have been entitled to severance pay.

For relief against ECM, the Trustee seeks to avoid allegedly fraudulent transfers, subordinate and/or avoid liens and preserve them for the benefit of the bankruptcy estates, and to disallow claims.   For relief against Goodwin and Goggin for breach of fiduciary duty, the Trustee seeks compensatory, exemplary and/or punitive damages on behalf of the estates and their creditors.

V.    **The Trustee's Motion to Dismiss**

On November 25, 2015, the Trustee filed the Motion to Dismiss the CAM Complaint contending the claims asserted by the CAM Funds belong exclusively to the Trustee.   Although the CAM Funds concede that only the Trustee may pursue breach of fiduciary duty and fraudulent conveyance claims, they counter that their claims against ECM for tortious interference are personal claims for injuries specific to them.

The CAM Funds assert that the state court's denial of ECM's motion to dismiss establishes that the tortious interference claims are their property which "cannot be stripped away by virtue of the Debtors' bankruptcy filing."   [CAM Resp. ¶ 38.]

**JURISDICTION**

This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b), (e).   This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(A).

Pursuant to 28 U.S.C. § 1334(e), this Court has "exclusive jurisdiction . . . of all property, wherever located, of the debtor as of the commencement of such case, and of property of the estate."   "Courts have also determined that in connection with exercising exclusive jurisdiction over property of the estate, the bankruptcy court also has exclusive jurisdiction to determine

whether or not property is property of the estate." *In re Brown*, 484 B.R. 322, 332 n. 3 (Bankr. E.D. Ky. 2012). A proceeding to determine property of the estate is a core proceeding under § 157(b)(2)(A)). *Brown v. Fox Broad. Co. (In re Cox),* 433 B.R. 911, 920 (Bankr. N.D. Ga. 2010).

## LAW AND ANALYSIS

"Property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The debtor's interest in property is determined by nonbankruptcy law, but the determination of what constitutes section 541 property is a federal question." *Koch Ref. v. Farmers Union Cent. Exch., Inc.,* 831 F.2d 1339, 1343 (7th Cir. 1987). Property of the estate includes causes of action. *Id.* at 1343-44; *Honigman v. Comerica Bank (In re Van Dresser Corp.)*, 128 F.3d 945, 947 (6th Cir. 1997). "A debtor's appointed trustee has the *exclusive* right to assert the debtor's claims. 'If, on the other hand, a cause of action belongs *solely* to the estate's creditors, then the trustee has no standing to bring the cause of action.'" *Van Dresser*, 128 F.3d at 947 (alterations in original) (quoting *Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994)). "Whether a creditor has a sole right to a cause of action is determined in accordance with state law." *Van Dresser*, 128 F.3d at 947; *accord Koch Ref.*, 831 F.2d at 1344 (looking to state law to determine whether a trustee can bring an alter ego action in order to determine whether the action was property of the estate).

In addition to the Debtors' causes of action, the Trustee has the exclusive right to bring causes of action created by the Bankruptcy Code, including avoidance actions set forth in chapter 5 thereof*; e.g*., fraudulent conveyance, lien avoidance. *Reed v. Cooper (In re Cooper)*, 405 B.R. 801, 807 (Bankr. N.D. Tex. 2009) ("[I]t is rather widely accepted that only the trustee (or

9

debtor-in-possession in Chapter 11) has independent standing to pursue chapter 5 avoidance actions and other estate causes of action."); *see also* 11 U.S.C. § 544 ("The *trustee* shall have ... the rights and power of, or may avoid any transfer of property of the debtor ... that is voidable by a creditor." (emphasis added)); 11 U.S.C. § 548 (With regard to potential fraudulent transfers, "[t]he *trustee* may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor." (emphasis added)); 11 U.S.C. § 550 (With respect to avoided transfers, "the *trustee* may recover, for the benefit of the estate, the property transferred ..." (emphasis added)); 11 U.S.C. § 551 (Avoided transfers are "preserved for the benefit of the estate but only with respect to property of the estate."); 11 U.S.C. § 541(a)(4) (Property of the estate includes "[a]ny interest in property preserved for the benefit of or ordered transferred to the estate under section . . . 551 of this title."). The proceeds of these actions are likewise property of the estate. 11 U.S.C. § 541(a)(6).

Contrary to the CAM Funds' assertion that the state court's denial of ECM's motion to dismiss confers property rights on them with respect to the tortious interference claims, the Trustee's exclusive right to bring avoidance actions arising under the Bankruptcy Code, may serve to bar an otherwise valid creditor's action—particularly if such action seeks relief based on injuries common to those suffered by the debtor, the bankruptcy estate, or the estate's creditors. *In re Swallen's Inc.*, 205 B.R. 879, 884 (Bankr. S.D. Ohio 1997) (plaintiff was seeking redress for the very same acts that were the basis of the trustee's proposed settlement of its fraudulent conveyance and preferential transfer claims against the same defendants); *Highland Capital Mgmt., L.P. v. Welsh, Carson, Anderson & Stowe, VI, L.P. (In re Bridge Info. Sys., Inc.)*, 344 B.R. 587, 596 (E.D. Mo. 2006) (underlying focus of plaintiffs' claims was the same as the plan administrator's § 548(b) fraudulent conveyance claim). The label on the claim does not control

the analysis. "To allow selected creditors to artfully plead their way out of bankruptcy court would unravel the bankruptcy process and undermine an ordered distribution of the bankruptcy estate." *Id*. (quoting *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc.*, 187 F.3d 439, 442 (4th Cir. 1999)) (internal quotation marks omitted).

There are divergent views as to how courts analyze whether a debtor owns and/or a bankruptcy trustee has the exclusive right to pursue an action against a third party such that a creditor is prevented from bringing the claim on its own behalf.

*Van Dresser*, the leading Sixth Circuit case addressing competing state law claims, established the following factors for courts to consider in determining whether either the trustee or the creditor has the sole right to a cause of action:

1. "[I]f the debtor could have raised a state claim at the commencement of the case, then that claim is the exclusive property of bankruptcy estate and cannot be asserted by a creditor." *Van Dresser*, 128 F.3d at 947.

2. "Conversely, if the cause of action does not explicitly or *implicitly* allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of case, and thus is not property of the estate." *Id.* (emphasis added).

3. Finally, if under the facts alleged in the creditor's complaint, both the debtor and the creditor could assert state law claims for damages against the same defendants, "[t]he only question is whether *both* [creditor] and [debtor] could *recover* on their claims." *Id.* If a judgment against the defendants by either the creditor or debtor in state court would preclude the other from a subsequent recovery, "then the claims are not truly independent, and by default the claims are exclusively property of the trustees in bankruptcy." *Id*. at 947-48.

In *Van Dresser*, the plaintiff, a shareholder and guarantor of the parent debtor corporation, sued an officer of one of the debtor's bankrupt subsidiaries along with a bank and a bank employee alleging that defendants bilked the debtors out of $2.7 million causing the plaintiff, as guarantor, to pay $1,125,000 on parent debtor's loans.  He filed an action in state court seeking to recover that loss plus his costs and attorney fees.

Similar to this case, the *Van Dresser* defendants removed the case to the bankruptcy court. Previously, *Van Dresser's* trustee had entered into a court approved settlement with the bank, but the trustee's actions were still pending against the two individual defendants.  In affirming, in part, dismissal of the plaintiff's complaint as to the alleged tortious conduct, the Sixth Circuit found that the debtors *and* the plaintiff could state claims for damages against defendants.  *Van Dresser*, 128 F.3d at 947.  However, because the defendants were only required to repay the principal amount once, only the debtors' estates could recover from the defendants.  *Id*. at 948. Thus, the bankruptcy estates' recovery via settlement with the bank made the plaintiff whole as to his loss against the bank.  "Simply put, the debtors' estates can, and did, recover from the [bank] for [plaintiff's] *and* [debtors'] *common damages*.  Any recovery by the plaintiff would benefit him twice; once as guarantor and again as creditor."  *Id.* at 949 (emphasis added).

Here, the CAM Funds concede that the estates' claims for breach of fiduciary duties and fraudulent transfer may only be brought by the Trustee.  They argue, however, that their tortious interference claims are claims personal to them with distinct elements and injury.  They argue their claims "simply concern claims for monetary damages stemming from ECM's well-documented role in causing the breach of the Agreements."  [CAM Resp. ¶ 7.]

"The elements of a tortious interference with contract claim under New York law are the existence of a valid contract; defendant's knowledge of the contract and intentional interference

with it; and a resulting breach and damages." *In re Eagle Enters., Inc.*, 265 B.R. 671, 680 (E.D. Pa. 2001). As to damages,

> "[o]ne who is liable to another for interference with a contract or prospective contractual relation is liable for damages for (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference."

*Int'l Minerals & Resources, S.A. v. Pappas*, 96 F.3d 586, 597 (2d Cir. 1996) (quoting RESTATEMENT (SECOND) OF TORTS § 774A (1977)). As noted above, New York recognizes an "economic interest defense" and to overcome such defense, a plaintiff must show wrongful conduct. *Nielsen Co.*, 112 F. Supp. 3d at 113.

The CAM Funds contend that their claims do not hinge on fiduciary misconduct or on unwinding challenged transactions which they concede belong exclusively to the Trustee. However, the CAM Complaint is replete with allegations that ECM's members, who were also U.S. Coal's board members, "abused their authority and violated their duties to U.S. Coal" in a manner that benefitted ECM and ECM's members to the detriment of the CAM Funds:

> 31. . . . US Coal's directors and management have consistently flouted their contractual and fiduciary obligations to CAM, putting their own interests as members of ECM ahead of those of [US Coal], its shareholders, and its lenders. The manifest conflicts of the ECM members who also serve on US Coal's Board have infected many, if not most, aspects of [US Coal's] corporate governance and decision-making. [CAM Compl. ¶ 31.]
>
> . . . .
>
> 33. . . . While failing to make payments on the JAD Equipment Note, upon information and belief, [US Coal] and its subsidiaries have nevertheless made payments on indebtedness owed to ECM. [CAM Compl. ¶ 33.]
>
> . . . .
>
> 40. On information and belief, members of ECM have instructed US Coal not to make the repurchase payment required by the [Put] Agreement until ECM's debt has been paid in full. [CAM Compl. ¶ 40.]
>
> . . .

    50. On information and belief, ECM caused US Coal to enter into these transactions and disregard its obligations under the [Management Agreement]. In doing so, ECM members abused their authority and disregarded their obligations to US Coal. [CAM Compl. ¶ 50.]

    51. . . . . Indeed, since November 2009, US Coal—at the direction of its directors has made amortization payments to ECM in excess of those required under the applicable transaction documents, while repeatedly failing to make required payments to other lenders, including CAM. [CAM Compl. ¶ 51.]

To support their claims against ECM, the CAM Funds incorporated all of the above allegations into each claim for relief for tortious interference against ECM, as follows:

    74. ECM, through its members, intentionally caused US Coal to default on the [Put] Agreement by, among other things, directing US Coal to refuse to repurchase CAM's 425,000 shares. In providing this direction, members of ECM abused their authority and violated their duties to US Coal. [CAM Compl. ¶ 74.]

    . . . .

    79. ECM, through its members, intentionally caused JAD to default on the JAD Equipment Note by, among other things, directing that JAD not make payments required under the JAD Equipment Note. In providing this direction, members of ECM abused their authority and violated their duties to US Coal. [CAM Compl. ¶ 79.]

    . . . .

    84. ECM, through its members, intentionally caused US Coal to default on the [Management Agreement] by, among other things, directing US Coal to enter into certain transactions without CAM's consent. In providing this direction, members of ECM abused their authority and violated their duties to US Coal. Moreover, certain of these transactions will directly benefit ECM and its members. [CAM Compl. ¶ 84.]

Thus, although couched in terms of tortious interference with contract, the alleged intentional interference is grounded in ECM's (and its members') alleged breach of fiduciary duties and diversion of assets.[5] This in and of itself interferes with the Trustee's exclusive right to bring the Debtors' breach of fiduciary obligation claims and avoidance actions.

---

[5] As noted earlier, to survive dismissal of their claims before the New York state court based on ECM's claimed economic interest defense, the CAM Funds relied on their allegations that ECM's members engaged in wrongful actions by violating their duties to U.S. Coal.

Moreover, the competing claims share a common injury. The CAM Funds allege that ECM tortiously interfered with their rights under the Management Agreement by causing U.S. Coal to enter into multiple financial transactions and terminating Mr. Gabbard's employment without the CAM Funds' consent. All of these transactions allegedly resulted in financial damage to *U.S. Coal*; i.e., U.S. Coal paid Mr. Gabbard $1.2 million when he was not entitled to any severance [CAM Compl. ¶ 43]; U.S. Coal will pay in excess of $10 million in additional interest payments to insiders and creditors, including $3 million to ECM [CAM Compl. ¶¶ 44-48.]; and to the exclusion of the CAM Funds and other lenders, U.S. Coal made amortization payments to ECM in excess of those required under the applicable transaction documents [CAM Compl. ¶ 51.]

For relief, the CAM Funds assert they are entitled to payment of an amount to be determined at trial, and rescission of the debts incurred, and affiliate transactions entered into, by U.S. Coal without their consent. The Trustee seeks damages from ECM and other defendants on behalf of the estates for these same actions. As in *Van Dresser*, to the extent ECM is found liable for the above actions, it will only be required to pay such sums once. Simply put, the Trustee Complaint seeks to recover the debtor corporations' damages which will inure to the benefit of their creditors, including the CAM Funds. The estates' recovery takes precedence over the CAM Funds' and they will recoup their damages pro rata through the bankruptcy estates. *Van Dresser*, 128 F.3d at 949.

Similarly, the CAM Funds allege that ECM tortiously interfered with their rights under the Equipment Note and Put Agreement by directing Debtors withhold payments from the CAM Funds while directing the Debtors to continue paying ECM. For relief, the CAM Funds assert

they are entitled to payment from ECM of the alleged balance due on the Equipment Note, $4.2 million, and $2.25 million on U.S. Coal's obligations under the Put Agreement.

If the Trustee prevails in her action, proving that ECM wrongfully favored its interests over that of the Debtors and their creditors, she may recover damages from ECM including amounts ECM caused to be paid to itself under theories of breach of fiduciary duty and fraudulent transfer. This recovery will include the damages the corporations, and thus each of their creditors—including the CAM Funds—suffered at the hands of ECM's alleged wrongful acts. *See Ruppert Landscaping*, 187 F.3d at 441 (unless abandoned by trustee, plaintiff lacked standing to bring claims, including tortious interference with contract claim, which depended on showing fraud or other unlawful action by defendant which was also harmful to debtor); *Bridge Info. Sys.*, 344 B.R. at 595-96 (under state law, tort claims—which included a tortious interference claim—belonged to the corporation because they were essentially ones to recover improperly diverted corporate assets and further, to the extent tort claims are similar to a § 548(b) fraudulent conveyance claim, they belong exclusively to the plan administrator); *Swallen's*, 205 B.R. at 884 ("in view of the allegations contained in the complaint, there is no question that the plaintiffs . . . are seeking redress for the very same acts which are the basis of the [committee's] claims . . . .").

Notwithstanding the clear allegations in the CAM Complaint (and apparently now recognizing that allegations that ECM was receiving payments when other creditors were not overlap with the Trustee's fraudulent conveyance claims), the CAM Funds contend that "[w]hat U.S. Coal did with the money not paid to the CAM Funds is immaterial to [their] claims for tortious interference." [CAM Resp. ¶ 51.] They argue that their injuries for the interference are distinct from injuries for the diversion of funds alleged by the Trustee, and the Debtors were not damaged at all from ECM's interference because this resulted in Debtors *retaining* funds that

could otherwise have been paid to the CAM Funds. Do independent injuries result from ECM's wrongful instruction not to pay the CAM Funds on the one hand (regardless of where the money went) and wrongful payment to itself on the other? No.

As noted during argument, the claim of tortious interference in the context of a bankrupt debtor's nonpayment of a contractual debt is particularly troublesome in that every creditor who did not receive payment could potentially have a distinct tortious interference claim based on its distinct debt instrument. A third party's interference with a debtor's payment obligations may give rise to a particularized injury in terms of the amount of the creditor-specific unpaid contract; however, this ignores that the third party's actions—here abusing their authority and violating duties owed to the Debtors—injured the debtor company in the first instance, resulting then in the nonpayment of debt. While the Trustee has the exclusive right to bring the Debtors' causes of action, she also has the exclusive right to pursue transferees of the Debtors' assets and to marshal same for the benefit of all creditors.

The Trustee has the exclusive right to bring an action for the injuries alleged by the CAM Funds and to recover damages for the benefit of the bankruptcy estates. This conclusion is supported by a careful parsing of the nature of the interference asserted in the tortious interference cases cited by the parties. Cases which have specifically analyzed a tortious interference claim—as opposed to merely conflating various state law claims into one analysis— and allowed it to coexist with a trustee's or a debtor-in-possession's claim have factual bases other than nonpayment of debt. *See e.g.*, *Andrew Greenberg, Inc. v. Svane, Inc.*, 830 N.Y.S.2d 358 (N.Y. App. Div. 2007) (inducing debtor to disclose plaintiff's confidential trade secrets); *Roach v. Reldan Trading Corp.*, 321 F.2d 42 (2d Cir. 1963) (malicious interference with contract by fraudulently obtaining plaintiff's consent to sale of controlling interest in debtor); *Eagle Enters.*,

17

265 B.R. 671 (inducing debtor to terminate a contract upon which plaintiff relied in leasing equipment to debtor; but remanding for determination of whether claims should be enjoined because they could interfere with orderly resolution of bankruptcy proceedings).

The CAM Funds cite only one case suggesting that a creditor's claim against a third-party for tortious interference with a debtor's payment obligation is not an asset of the debtor's bankruptcy estate. *P&F Indus., Inc. v. Medallion Grp., Inc.*, 476 N.Y.S.2d 928 (N.Y. App. Div. 1984). That case is distinguishable. In *P&F Industries* the plaintiff's tortious interference claim was brought against a debtor's affiliates that allegedly diverted money from a trust account held by the debtor for the benefit of the plaintiff. The debtor never had legal title to the trust account funds; thus, the funds were not property of the bankruptcy estate and the injury to plaintiff was personal which the trustee could not have asserted. The CAM Funds do not contend that payments owed to them were held in a trust account established for their benefit.

The CAM Funds' claims all seek redress stemming from ECM's members' breach of fiduciary duties owed to the Debtors which resulted in U.S. Coal's and JAD's nonpayment of debt owed to the CAM Funds.

## CONCLUSION

Based on the foregoing, claims one through three of the CAM Complaint asserting causes of action against U.S. Coal and JAD will be dismissed without opposition. Claims three through six asserting causes of action against ECM which the Trustee has the exclusive right to pursue will be dismissed. An order in conformity herewith shall be entered.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Tracey N. Wise*
**Bankruptcy Judge**
Dated: Monday, May 09, 2016
(tnw)